Thank you, Your Honors. May it please the Court, Mr. McClain and members of the audience, thank you very much for this opportunity. My name is Roger Roots. I represent Rudolph George Stanko. Stanko is the appellant in this case and the defendant in a criminal prosecution going back to, I believe, 2005, originally involving improper possession of firearms and ammunition. In this case on appeal, he is appealing his revocation of his supervised release last year, and his supervised release was revoked for six grounds. And I think when you look at the record of those grounds, I think most of us would conclude they are quite trivial, much more trivial, by the way, than grounds that I've seen in almost any other appellate case, by the Ninth Circuit or any other circuit, for a revocation. And he was given the very maximum sentence in prison. He served 13 months. He was sentenced to 13 additional months in Federal prison and 23 additional months on supervised release. Now, I want to address the specifics of each of those six counts that he was accused of violating, but I think also that I want to – I think this case says a lot about the constitutional problems with supervised release itself, because there are some serious separation of powers problems. We all know it is often said that power corrupts and absolute power corrupts absolutely. In this case, it is sort of ironic that the U.S. district courts have, over a time since 1986, have really become corrupted by power in the area of supervised release. We know that the supervised release was really invented in 1986, along with the – during that period when the sentencing guidelines, the U.S. Sentencing Reform Act was enacted by Congress. Now, it didn't come out of the blue. The concept of probation has been around for a good long time. Right. And parole, which preceded the – I mean, what – the statute largely did away with what used to be Federal parole. But the same notion of being released with oversight has been in the law for a good long time. Yes, but maybe a century or so. But supervised release is a little bit different. And I say that because in parole or in probation, the person is serving his sentence, the – and it's with the consent of the government. He gets benefits. He benefits from a sort of situation in which he is released on conditions, and he is serving the sentence. He would otherwise be in prison. Parole and probation are prison substitutes. Not so in the same way with supervised release. Supervised release is a little bit different. And that's why I think we need to establish a more clear rule that there is a greater liberty interest, greater than probationers, greater than parolees for people on supervised release. Remember, Mr. Stanko had served his entire Federal prison sentence. He was accused of essentially new offenses, new crimes, actually crimes, if you look at it that way, which were invented by the judicial branch of government, not lawfully by Congress with all the vetting. Felon in possession of a gun was not invented by Congress, 922G? Well, yes, that was. That was his original conviction. And if you look at, by the way, 922G, it says what are the penalties. It says the penalties are so-and-so. You look at that statute, so-and-so up to so many years in prison or a fine of such and such, not even mentioning this additional notion that can be tacked on, that was a standalone statute that came a few years later, the supervised release statute that sort of ---- Could Mr. Stanko have refused supervised release and insisted on spending the rest of his sentence in jail? Ironically, no. Ironically, no. What's really fascinating about it, this is why it's so different from parole or probation. Mr. Stanko is confronted in the days before he's released from prison with these forms that he's asked to sign. And these forms waive all his rights and waive his rights and say he agrees to these conditions, many of which are unconstitutional or invalid as applied to him. And he, unlike most people, says, no, I'm not going to sign that. What happens when he refuses to sign? If he were going to be released on parole, what would happen? He would be kept. If he were going to be released on probation, what would happen? He would be kept. But the fact that it's supervised release is a very special thing. The government actually has to release him, even though he won't sign these documents. By the way, for the record, he was later punished by the district court for not signing. This is what every American should do when a government official hands him a form and says sign this. They should say, wait, I want to consult an attorney. I want to think about my rights. These conditions were imposed at the time of sentencing originally, correct? Yes, but he had never signed anything agreeing to them. And he was challenged. They were imposed by the district judge at the time he was sentenced for the crime. Yes. And the whole purpose of supervised release, I shouldn't say the whole purpose, it has many purposes probably, but the one salutary purpose is to reintegrate people back into society. Isn't that true? Yeah, in fact. In fact, what you've got is somebody who has broken the law and we can't just say, okay, well, you're totally free now. I mean, that's the idea behind it, I think. You're free with certain conditions. Now we try to help you get a job, get back into society, become productive again. And that's why supervised release is for such a relatively short period of time. I mean, 1, 2, 3, up to 5 years maybe, more like time sometimes. Yeah. My footnote 7 on my original brief. According to Congress, the primary goal of a term of supervised release was, quote, to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense. By the way, we can argue whether his offense was that particularly serious. Or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes, but still needs supervision and training after release. And you see this written into the statutes and into the guidelines also. The idea that this is to help the defendant, this is to help the releasee, the supervisee, the record is blank in this case, absolutely barren of any help or assistance or rehabilitation. Your client seemed to demonstrate he needed help and assistance because the district court concluded he showed no respect for the law whatsoever. And so maybe we're going to have to teach him a lesson to pay some more attention in the future. And that was the reason for the rather strict sentence for the supervised release violations. And there were a lot of violations. You can call them trivial, but they added up. Well, let me just say that, as you point out, the district court punished him. If you really look at sort of the lecture at the end, because he wouldn't sign. He was insisting on his rights. He wouldn't waive all his rights. He was insisting on doing what I think most Americans should do. So he got the alternative, which you said he didn't have the option for at the front end, but he certainly did at the back. He's going to serve some more time in prison and get a chance to think about it. Well. I mean, you can debate the probation and supervised release system all you want, but Congress has set it up in this way, and I don't see here an attack that tells us that Congress didn't have the power to do it. Well, in this case, it sets up the district courts as judge, jury, and executioner, punisher. And remember, the U.S. probation officers, unlike parole officers formerly who were in the executive branch of government, the probation officers are in the judicial branch of government. And I think the direct language of the statute, probation officers serve under the direction of the court. So when you see a probation revocation proceeding, you are seeing the district court acting as a judge in its own case, employing the complainant, employing the accuser, and basically the agents of the prosecution. All employed by the United States government, it happens. Well, yes, absolutely. But respectfully, the founding fathers, if you remember the language of the Federalist, I'm not sure whether that was Hamilton or which person, he used the word jealousy among the branches. The whole point is that the different branches would protect the American people from the abuses of another branch. In Stanko's case, he had no protector. No one was looking out for him. The district court was his very accuser and his punisher, his prosecutor, his star witness. Every agent in that courtroom was against him, and he had no one to protect him. The district courts are supposed to protect the American people from the abuses of the political branches of government. In this case, and I would argue that in a supervised release, generally across the United States, these notions of trusting, these notions of rehabilitating and helping are an illusion. These are battering rams. This was a battering ram, I use that term, of government power against someone in which the district courts have essentially taken on the role of prosecutor, punisher, accuser. And by the way, they do so probably subconsciously. I don't suggest for a moment that there's some insidious evil plot going on. This is, it's just absolute power tends to corrupt absolutely. In Stanko's case, he was punished for not signing. He was said, as you say, not cooperating. Well, in my mind, that's just standing on your rights as an American citizen. I haven't really touched on the specifics. He was accused, he was accused amongst these six little things. One was getting a traffic citation, a warning for allegedly going 5 miles per hour over a posted speed limit in rural Nebraska. It was said that he was supposed to report to his probation officer that he was, quote, questioned by law enforcement. Well, you know, in the brief, I deal with this. If you ask me if I can. Kennedy. If you deal with it and suggest the questions, how's the weather and can I see your driver's license registration and proof of insurance are exactly the same? Well, one is just, I think they're quite similar. If you were to ask me in the hallway, Mr. Roots, I've misplaced my brief. Could I look at a copy of yours for a second? I would never think that you, that I had been questioned by Judge Clifton. You know. And I would agree with that. Yeah. I mean. But is the request can I see your license registration and proof of insurance the same thing as a passing social comment, or isn't that a directed inquiry by a law enforcement officer? Well, it's an inquiry, may I see your documents. By the way, we don't even know because it was hearsay in this case, which is another violation, a denial of rules of evidence. We don't even know because the officer was, it was just repeated hearsay by the probation officer, that the officer said, can I see your driver's license instead of present your driver's license proof of insurance, or let me see, which is not a question. So that wouldn't be questioning by law enforcement. It gets this trivial. And then there's all this stuff about associating with convicted felons. Sending a letter in the mail, which was never received by the other side, just cannot, cannot be associating. Receiving a phone call, why not? If the other party doesn't receive the envelope. From your client's perspective, he was doing whatever he could to associate with that person which he knew was in prison, he knew was a convicted felon. Yes, but he was not convicted. He was not convicted of attempting to associate. He was wrongly convicted of associating. He did not associate. Receiving two phone calls, each one, by the way, associating. So one phone call is an association. It's just preposterous. It goes to show you that the proceedings against Mr. Stanko overwhelmingly favored the prosecution. And then there's the question on a form where Mr. Stanko had placed a question mark, have you had contact with a convicted felon last month. Well, one, I am a convicted felon. I state this in my case. Kennedy, we should have answered the question yes. Well, he put a question mark. I think all of us would. Is your position is that he didn't know that Baugus was a convicted felon? He had eaten with him and he had palled with him in prison. There's no question of that. Next. Let's go to something else. Yes. There's no question. The question is whether that's association. Talking to a convicted felon on the telephone about UCC forms? Well, if you use as liens against people they don't like? Association? Yeah, I would like to. That's a great discussion about that. Some part you start to ask, what colors the sky in his world anyway? The rest of us understand that as association. If he doesn't, well, that's unfortunate, but that's how it is. I would like to reserve just this one minute for a possible rebuttal if there comes to that. Thank you. May it please the Court, Your Honors. My name is Chris McLean. I'm an assistant United States attorney from Missoula, Montana. I think that the record in this case really does reflect, as Judge Siebel found, Mr. Stanko had no respect for the law. As soon as he was released from prison, he refused to sign his rules of release and then he began a consistent pattern of deception with the probation officer and the court that was well vetted at the supervised release revocation hearing and properly found by Judge Siebel to be six violations of the supervised release. Mr. McLean, may I ask you a question about the first one? Yes, sir. About the condition of release was that he was to report whether he had been arrested or questioned, unquote, about a crime. Right? Arrested for a crime or questioned about a crime. Right? Now, I like the rule of statutory construction, which is that words next to each other share their meaning, a justum fati ne. Right? Now, if that's so, tell me about what crime was he questioned by the police officer in Nebraska when he was asked for his documentation. There were no questions about the speeding. There were only questions about the documentation or the registration, his driver's license and registration. Is that questioning about a crime? Your Honor, from the government's perspective, the officer was investigating a potential. No, no, no. Not investigating. That's another word. Questioned. Arrested or questioned. Was he arrested for a crime? No. No. Was he questioned about the speeding crime or was he asked for his documentation, which was a different crime? Maybe. Do you think that that was questioning about a crime? It could be, or as you have described it, it could not be. Right. So let's think that that may be shaky. Let's do that. And the government will urge the Court to consider that there were five other violations that the district court found and that either or any of those could have been the basis for the sentence, the revocation and then the sentence that was issued. Certainly his response about whether he had associated with a felon, given the attempts to reach Mr. Baugas by sending him UCC forms and the telephone calls from Mr. Baugas, is a sturdier ground. In our view, it is perhaps the most serious violation, and especially his reaction when he was confronted was to not tell the truth to his probation officer, but to try to parse words, talk about, well, I'm not sure if I associated with felons. There's lots of felons out there. Well, maybe my lawyers are felons. And finally, he just adamantly denied any sort of association with felons, despite the fact that the government did produce recorded conversations of him talking with his prison buddy during the course of the supervised release hearing. And it was apparent. I mean, he was not out very long on supervised release before he engaged in this pattern of deception. He could not be trusted by the probation office. He could not be trusted by the district court. To follow the rules of supervised release, it was very apparent he was not going to do that. And that was the reason for the revocation, based on the evidence before the district court. Kennedy. Now, how about the condition of release that's now imposed, that he submit to a warrantless search? There were no specific findings, as I recall. Is that justified? Or was that liberty and arrest violated? Your Honor, the defendant had, before he ran into Judge Siebel's courtroom for this particular proceeding, been convicted of a fraud type of crime. The Federal Meat Inspection Act. He'd also been convicted of being. That wouldn't justify a warrantless search, would it? Well, in conjunction with everything, with his characteristics and his felony record, which included the firearms possession, the firearms possession being one that would justify this sort of a condition. The defendant asserts in his reply brief, as well as to this Court, that he received the maximum sentence. That is not the case. The maximum sentence at this particular hearing would have been 24 months. But he did receive the top end of the guideline range.  And he also urges the Court to consider these petition violations as new crimes. But as we have pointed out, the authority of this Court in Mejia Sanchez says, really, without any doubt, that supervised release proceedings are not crimes. It's not allegations of crimes. So the authority is against the defendant on that issue. What supervised conditions did the Court impose on sentencing for this violation? Do you understand my question? In other words, I find you guilty that you violated these conditions of supervised release, so I'm going to sentence you to 13 years, 13 years? Thirteen months. Yes. To be followed by a period of supervised release of blank months, blank. What conditions were imposed by Judge Siebel? Well, we have the we have our judgment in our record, but he imposed numerous standard conditions as well as two additional special conditions that the defendant is complaining about before this Court, the search and the financial disclosure conditions. Maybe I wasn't clear, but for the violation of supervised release, did Judge Siebel impose new conditions? Did he impose a new term of supervised release? In other words, I find you guilty of the violation of supervised release. You're going to be sentenced to prison and that's going to be followed by new conditions. Yes, yes. Your Honor, those are all the issues I wanted to address based on the defendant's argument. If you have any more questions, I'd be happy to try to answer those. Otherwise, I'll yield my time. Thank you. Thank you. Thank you, Your Honors. Mr. Roos? You know, I have a little bit of confusion.  It was possible two years for the violation, and I just heard my brother say that he could have been sentenced to two years. I just haven't seen that statute. I don't know where that comes from, because the actual, if you look at the sentencing guidelines for violations on revocation, it says these ranges, and I just haven't seen that two years. But maybe I would invite someone to show me where that is. I just haven't seen it. With that, I don't have anything further. Thank you very much. Thank you. We thank both counsel for your arguments. The case is submitted.
judges: Mahan, Clifton, Bea